# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

CHRISTOPHER COOK,       )
                              )
     Plaintiff,        )
                              )
vs.                      )     CIVIL ACTION NO.:
                              )     2:12-CV-02122-KOB
HUBBELL POWER SYSTEMS, INC.,  )
                              )
     Defendant.      )

## MEMORANDUM OPINION

This case, alleging that the Plaintiff's employer subjected him to sexual harassment at work, is before the court on "Motion for Summary Judgment by Hubbell Power Systems, Inc." (Doc. 15). This matter has received thorough briefing. For the reasons stated in this Memorandum Opinion, the court FINDS that the motion is due to be GRANTED.

## I.  FACTS

The Defendant, Hubbell Power Systems, Inc., manufactures high voltage switchgear for electric utility companies. The Plaintiff, Christopher Cook, began his employment with Hubbell on May 11, 2009 as a Product Designer. In that position, he was responsible for designing control mechanisms to operate substation switches and for communicating with Hubbell's production department to develop the end product. His work product included the preparation of (1) a design drawing of the control; (2) a list of materials needed to develop the control; and the

(3) a document specifying the size of the relevant equipment needed.  Although Cook's supervisors characterized him as a "fast" designer, he made design errors.

As a result of Cook's design errors, on September 9, 2010, his supervisor, Engineer Stephen Donohue, placed Cook on a performance improvement plan ("PIP").  Under this PIP, Cook was required to increase his design drawings without errors; follow established procedures for producing and checking control drawings to minimize mistakes; take initiative when confronted with problems and perform actions to seek immediate resolution; and demonstrate improvements in both oral and written communication.  Cook received a warning that failure to improve could result in disciplinary action up to and including termination.

The next month, October of 2010, Hubbell hired Laura Woods as a Production Engineering Supervisor, and she became the manager of the Production Engineering Group, meaning that she became Cook's immediate supervisor and also managed three other Product Designers.  Donohue, the former manager, advised Woods that Cook was subject to a PIP, provided Woods with a copy of Cook's PIP, and explained that he and his manager, Hernan Figueroa, had been watching Cook's errors closely.

In late 2010, Hubbell restructured the organization of certain groups so that the entire Product Design Group began to report to Business Unit Manager Dan Richards, including Woods's Production Engineering Group; Richards became Woods's supervisor.   During the management transition that occurred towards the end of 2010, no one was meeting monthly with Cook to discuss his PIP and follow up at regular intervals as his 2010 PIP had provided to determine whether he was meeting his plan goals.  Although none of Cook's supervisors ever

told him, either orally or in writing, that Hubbell had abandoned Cook's 2010 PIP, Cook understood he was "off" of it.

     As the new supervisor, Richards eventually met with each member of the Product Design Group, including Cook.  Cook understood that Richards was not aware that his 2010 PIP existed until Cook brought it up with Neil Vandermeulen, Richards's supervisor, who was working alongside Richards with employee interviews during the transition.  In a one-on-one meeting with Cook in which Woods was not present,  Richards informed Cook that he and Woods had decided to remove Cook from the 2010 PIP and "start off on a clean slate."  (Doc. 17-2, at 32, p. 123).  However, Cook understood that even with confirmation of his clean slate, he "still needed to perform to maintain that clean slate."  Doc. 17-2, at 33, p. 127.  Richards explains that the reason for the "clean slate" was that, given the new management, Woods and Richards wanted an opportunity to monitor Cook and evaluate his performance for themselves.

     After Richards and Woods became Cook's supervisors and gave Cook a clean slate, he continued to make errors, and, in his deposition testimony, he acknowledged those errors, characterizing some of them as "the same mistakes" and some resulting from changing management systems.  *Id.*   For example, Cook agrees that he made mistakes relating to equipment size, incorrect dimensions, incorrect position of equipment on the design drawings, incorrect materials, and sometimes Cook also failed to include the necessary components of a design drawing or to order the appropriate quantities of equipment to develop a control switch. Further, Cook sometimes failed to notify production that he had changed a design, resulting in production designing materials that were ultimately wasted. These errors were not always Cook's

3

fault; sometimes, for example, the errors emanated from customers' failure to provide correct information.

To control errors in the work product of Cook and other employees, in January or February of 2011, Woods and Richards requested that Ronnie Mize and Ron Chamblee from the marketing department check the designs of the Product Design Group for mistakes, including but not limited to Cook's designs. Errors are often discovered in the production stage as the production department attempts to manufacture an end product from the designs that the product designers submit. Accordingly, Woods and Richards also asked Production Department employees Scott McLaughlin and Derrick Taylor to generate a weekly Corrective Action Log[1] beginning in January of 2011, and Woods and Richard used this log as a device to monitor the errors Cook and others made. Woods, who also worked with customers and designers to correct the errors, testified that she received more design errors from Cook than any other designers.

The Corrective Action Log reflects that projects assigned to Cook had the following errors: February 2011 - 6 errors/2 design errors; March of 2011 - 11 errors/5 design errors; April 2011 - 4 errors/1 design error; May of 2011 - 26 errors/7 design errors; June of 2011 - 16 errors/10 design errors; July of 2011 - 11 errors/8 design errors; August of 2011 - 8 errors/5 design errors; September of 2011 - 6 errors/2 design errors; October of 2011 - 8 errors/5 design errors; November of 2011 - 4 errors/2 design errors. None of the other employees listed had as

---

[1] Cook claims in his fact section that the Corrective Action Log no longer exists to confirm or deny Hubbell's claims of error; however, Woods's Declaration (Doc. 17-8) attaches the log as Exhibit 1. The log lists a number of errors described as "drawing error" with a corresponding sales order number, and Woods provides a separate list, Exhibit 2, showing what employees are assigned to the sales numbers.

many total errors or total design errors.  Attached as Exhibit A to this Memorandum Opinion is a chart showing more specific information on the listed errors of the other employees.

Co-workers also notified Cook's supervisors of his errors.  Woods also heard from Cook's co-worker Tobias Head, a production engineering designer, that he had found mistakes in Cook's prototype drawings, as Head acknowledged in deposition testimony.

In addition to Cook's committing design errors, Woods also discovered that he failed to prioritize his work.  In his "to-do" stack of projects, she found design projects at the back of his stack that had earlier dates for completion and shipping than projects at the front of his stack. For example, on two occasions, Woods learned that projects with two-week completion periods were not completed on time while Cook worked on other projects that did not require immediate attention.  No other designers had problems prioritizing design projects.  While Woods communicated to Richards her concerns about Cook's failure to prioritize, Cook does not recall her pointing out this problem to him, providing him direction on prioritizing, documenting the problem, and giving him an opportunity to avoid the problem in the future.

Although Cook does not recall receiving supervisory direction about prioritizing, Cook acknowledges receiving a copy of Corrective Action Reports showing the list of errors, including his design errors; he recalls that some of the errors listed on Richards's compilation of errors using that 2011 Corrective Action Report are errors that he had made and about which he was notified.   (Doc. 17-2, at 128-29). Woods did not initially discipline Cook for his errors and prioritizing problems, but she alerted Richards about these concerns with his work.  Richards also heard about Cook's errors from other sources, such as complaints from the engineering department, marketing department, and customers like PEPCO and Santee Cooper Power, and

CLECO.  When Vandermeulen became aware of Cook's frequent design errors in early 2011, he

warned Richards that he "must do something to stop the number of errors. . . ."  (Doc. 17-6, at 4).

In February of 2011, Woods began preparing the 2010 annual performance evaluations

for Product Designers in the Production Design Group.  Because she had only managed the

designers for a portion of the year, she consulted the designers' previous supervisors, Donohue

and Figueroa.  On the 2010 annual evaluation, signed by Laura Woods on March 2, 2011,

Donohue and Figueroa rated Cook "Below Target."  Woods added comments based on her own

experience with Cook, stating:

> When I arrived, I found Chris to be very knowledgeable of the product and
> drawings considering being young and fairly new.  He is fast but tends to make
> mistakes.  I think maybe the speed may have something to do with the mistakes.  I
> was told that he was in the middle of the PIP because of a few problems.  I think
> he has improved and that he has a great attitude.  I think he knows that he has to
> improve and that he deserves the chance to show that he can do better.  The
> review stems from the PIP and had to come from previous supervisor for the
> majority of the performance period.  GOAL: Continue speed but lessen mistakes.
> Prove you deserve to be here and have learned from being placed in PIP.   Help
> others learn the product and drawings.

(Doc. 17-4, at 31).

Hubbell generally places employees who score "Below Target" on annual evaluations on

a PIP.  Even though Richards and Woods had removed Cook from his prior PIP, by the date of

the 2011 evaluation, they were more familiar with his work product, recognized that he

continued to make errors after the change in management, and were concerned enough about his

design errors to consider him as  candidate for a *new* PIP.   Woods testified that she and Richards

"determined that the errors were above and beyond normal and that it needed to be taken care

of."  (Doc. 17-5, at 7 p. 12).

Also in early 2011, Vandermeulen learned of Cook's frequent errors and expressed frustration to Richards.  Vandermeulen warned Richards that he had to do something about the errors coming out of the Product Design Group.  Accordingly, Woods and Richards testified that they, along with Vandermeulen, made a joint decision to place Cook on a second PIP as a result of his repeated errors and customer dissatisfaction with his work.  Marty Brack, Hubbell's Human Resources Manager, testified that he was also involved in the decision, and Richards testified that Brack agreed in 2011 that placing Cook on a PIP was an acceptable and warranted move.

While these supervisors did not document an exact date of their decision to place him on a PIP, all agreed that the PIP would have been developed *as a result of* the "Below Target" annual review dated March 2, 2011, and then the process of preparing the PIP could take a couple of months before the final PIP was dated and given to the employee.  Thus, the discussions about the PIP and the process of developing a PIP would have begun in March or April, although the final version of the PIP was dated July 12, 2011.

One step Cook's supervisors took in preparation for the PIP was getting the Human Resource department involved.  Richards stated in his affidavit that he approached Brack from that HR department shortly after the completion of the 2010 Performance Evaluations, and discussed Cook's performance issues.  Brack agreed that company performance management guidelines called for him to get involved when employees received evaluations that were "Below Target" to place them on a PIP, and his recollection is that he himself drove the process for placing Cook on a PIP in 2011.  Brack requested that Richards provide him with examples of Cook's design errors so that Brack could determine if the errors warranted PIP placement.  At

7

Richards's request, Woods prepared a list of Cook's errors.  Richards then took that list and added customer complaints he had received, compiling a document entitled "Documentation of Errors for Chris Cook's PIP."  (Doc. 17-6).  This compilation contains 52 specific errors and 3 general errors occurring between the first of January and September 19, 2011, with 13 errors occurring on or before the date of his March review and 36 occurring before the July 12, 2011 effective date of his PIP.  However, because the list extends into September, that version obviously was not compiled on or before the PIP date.  Although it contains Richards's name and the date August 12, 2011, which would correspond to Cook's thirty-day review for his PIP, the document contains errors that occurred after August 12.  The record does not reflect whether this document was originally compiled at an earlier date and then received updating through September.

In any event, Brack, Woods, Richards, and Vandermeulen all agreed that placing Cook on a PIP in 2011 was appropriate, and Richards drafted a written PIP with input from the other three.  The PIP raised the following concerns: Accuracy Concerns (listing specific examples of errors on four jobs and claiming "over $15k wasted in material and labor cost"); Throughput Concerns (claiming that Cook's rate varied and "[w]hen his throughput rate is very fast, errors often follow. . . ."); Urgency (noting Cook's "apathetic attitude about job errors and job completion"); Attendance (noting excessive absenteeism and an unacceptable failure to notify his supervisor when he will not be at work); Dedication (noting that his "commitment to getting his jobs completed seems to waver between somewhat engaged to indifferent"); and Organization (noting that "knowing which jobs are most critical is of paramount importance" and stating that sometimes Cook "has to be told to re-prioritize his work").  (Doc. 17-4, at 38-39).

8

The PIP purported to contain an action plan with "tangible improvement" goals for each concern. For example, under Accuracy, the tangible improvement goal is "Elimination of errors in Chris' designs." Under Throughput Concerns, the tangible improvement goal is "Throughput rate to increase substantially while errors decrease." Under Organization, the tangible improvement goal is "Chris should be able to organize his work by OPSD and respond quickly to changes as they occur. He should know the status of all jobs currently assigned to him. He should have notes on completed jobs in order to quickly answer questions from production." The PIP indicated that assessments of progress toward his requirements would occur monthly with the 30-day follow up review on August 12, 2011. (Doc. 17-6, at 9-10).

On July 12, 2011, Richards and Brack met with Cook to notify him of his placement on the PIP. Although Woods had input into the PIP, she was not present at the meeting. Cook recalls a discussion about the concerns listed, but, as to accuracy, recalls discussing mainly one job. However, he acknowledges being aware at the time of the July 12 PIP meeting based on the Corrective Action Reports that he had made a number of errors in his work product other than the one job discussed. He also acknowledges understanding at the time of the 2011 PIP meeting that he could receive further corrective action and be terminated if he did not improve.

The "Documentation of Errors" Richards prepared reflects that, from July 12, 2011 through August 12, 2011, the month after he was placed on 2011 PIP, Cook committed eleven errors. In his deposition testimony, Cook acknowledged that he continued to make errors after the July PIP meeting, and he could not identify any other employees who made more errors than he did.

9

Cook met again with Richards and Brack on August 12, 2011 to review his work. Richards's notes from this follow-up meeting reflect in part as follows: that he gave Cook an opportunity to ask questions and Cook asked none; that Cook did not provide any specific changes he had made to address the concerns; that Cook seemed surprised about the number of errors he had committed since the July meeting and had no concrete plans about how to decrease the errors, how to increase his output, or how to improve his performance; that Cook claimed to be unaware of jobs needing to be completed in any particular order; and that Cook excused his failure to complete work in a timely and accurate manner by blaming others or by complaining that no one had explained the matter to him.   Richards arranged another follow-up meeting the next week "to hear the plans Chris has to improve his performance."  (Doc. 17-6, at 11).

On August 19, 2011, Brack, Richards, and Cook had the scheduled follow-up meeting. In his notes of this meeting, Richards explained that the purpose of this follow-up meeting was to provide Cook another chance to communicate what he had failed to state at the August 12 meeting: "concrete, measurable goals to improve his performance."  Richards listed the ways Cook planned to improve, including, for example, researching the customer orders better and using a checklist for the job.  At the meeting, they discussed the reason why his errors had increased so much.  At the end of the notes, Richards stated that "it is becoming increasingly obvious that Chris is not be [sic] the right fit for a position where attention to detail is absolutely essential."  The next meeting was scheduled for September 19, 2011.

Richards's notes from the next meeting indicate that the meeting occurred on September 22 instead of September 19, and at the meeting, Brack and Richards advised Cook that "we were going to 'have to part ways' and that he would need to be looking for another job."  They

10

arranged a "'working severance' in which he would continue to work but would be allowed to take off whenever he needed (within reason) to interview for other positions in other companies." (Doc. 17-6, at 13).  The last entry on Richards's notes reflects that Cook's employment was terminated effective December 29, 2011.

Richards testified that he, Vandermeulen, and Brack decided to allow the working severance as a benefit to Cook, based on the understanding that he would find another job easier if he was employed as he applied for other jobs.  Richards stated that he has never allowed anyone else to have a working severance, but he had not terminated anyone other than Cook.

On January 5, 2012, Cook filed a charge of sexual harassment with the EEOC, followed by this sexual harassment lawsuit brought pursuant to Title VII and filed on June 6, 2012.  Cook alleges that Richards sexually harassed him on three occasions.  According to Cook, Richards, who is white, spoke to Cook, who is African-American, in a flirtatious tone of voice, twice asking if Cook had his chocolate in his peanut butter.  These remarks occurred on two separate occasions, but both took place near the printer as the two men were working.

On the first occasion, Cook acknowledges that both men were retrieving drawings from the printer at the same time, and the two print jobs were mixed together.  Cook simply responded to Richards's remark, "No, I don't," and walked away. No one witnessed this first exchange. Cook did not ask Richards to explain what he meant or otherwise clarify whether Richards intended the remark to carry a sexual connotation.

On the second occasion, Richards repeated the same words, again at the printer, when both Cook and Barry Hughes, a co-worker, were retrieving drawings from the printer.   Hughes said, "I'm white, so you can't be talking to me."  The deposition testimony is not clear whether

11

Cook then said—or simply thought—the following words: "He can't be talking to me."  Then, both Hughes and Cook walked away without further words.

Cook understood Richards was making a sexual advance when Richards made both of these comments.  However, he did not advise Richards of this understanding.

Richards testified that, when he made the "chocolate in my peanut butter" comment, he was referring to a Reese's peanut butter cup commercial and was making a joke about two print jobs getting mixed up with each other at a common printer, like chocolate and peanut butter combining in a Reese's peanut butter cup.  Richards acknowledged making this joke often at the printer to elicit a chuckle from whatever employee was sharing the printer; he did not limit this comment to Cook.

The third alleged incident of sexual harassment occurred approximately a month after the chocolate/peanut butter remarks.  During that general time frame, Richards was having one-on-one meetings with supervisees, not just Cook, to discuss "how to improve the op mech process, like how do we speed up the process without making mistakes, and do I have any ideas I could present to the team. . . ." In a private meeting between Richards and Cook in Richards's office, Richards asked Cook, "What would you say if I told you Laura said you look good with your hair down?"  Cook wore dread locks past his shoulders, and he would arrive at work with his hair down, and then pull his hair back during work hours, so workers rarely saw him when his hair was not pulled back.  Cook got his dread locks cut during lunch break one summer, and Cook recalls that this comment occurred after the haircut.  (Doc. 17-2, at 46 p. 183 & at 7 pp. 184-87).

At the same meeting, according to Cook, Richards also asked Cook how he would respond if "Laura says you have a nice behind?"  Cook's response to Richard's question was

"that I would tell her thank you, like if she was to have those comments." (Doc. 17-2, at 51, pp. 189-90).  Although Cook says that Richards's two questions regarding Laura Woods confused and upset him, Cook acknowledges that he did not advise Richards that his questions were inappropriate or that the questions made Cook feel uncomfortable.  Further, Cook did not tell Woods about Richards's questions involving her.

Richards denies making these references to Woods, although he does recall commenting to Cook after he shaved his head that his hair "looks great, but not that it didn't look good before."  (Doc. 17-7, at 38, pp. 145-46).

An issue exists whether these alleged incidents of sexual harassment occurred before, during, or after the formation of the 2011 PIP.  Cook admits to being "fuzzy" about the exact date of these incidents.  In the Charge of Discrimination dated January 5, 2012, Cook dates the sexual harassment as occurring "[a]round July 2011." (Doc. 17-4, at 58).   In November of 2012, Cook provided answers to interrogatories identifying the date of the  chocolate/peanut butter incidents as July/August 2011 and the remarks referencing Woods as "[n]o more than a month after the chocolate/peanut butter remarks."  (Doc. 17-4, at 47).  In his deposition testimony, however, Cook indicated that "chocolate/peanut butter" incident could have occurred as early as April/May of 2011 but when confronted with his interrogatory answers, he agreed that the comments occurred in the summertime and that he was not sure if they occurred in July or August of 2011.  Cook acknowledged that Richards's comment about Woods's attraction to Cook would have occurred in August or September of 2011, when the PIP process was already underway.  (Doc. 17-2, at 44).

Prior to Cook's termination in December of 2011, Cook did not report any of these alleged incidents of sexual harassment to Human Resources, to Hubbell's independent complaint hotline, or to any other source that Hubbell had identified as a means of reporting sexual harassment to the company.  The first notice to Hubbell of the alleged sexual harassment occurred when Cook filed the EEOC Charge in January of 2012.  Further, the record does not reflect that, prior to January of 2012, he advised Brack, Richards, Woods, or Vandermeulen of his characterization of these comments as sexual harassment or of his belief that the PIP or termination occurred because he refused what he characterized as Richards's sexual advances.

## II.  STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.

14

*Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id.* at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

16

## III.  DISCUSSION

In his Complaint, Cook asserts the claim of sexual harassment, stating that, as a result of refusing his supervisor's sexual advances, he was subjected to two adverse employment actions: placement on a PIP and termination as a result of refusal of supervisor's sexual advances.  Both parties agree that, because this case alleges sexual harassment based on a *tangible* employment action, he must establish the following elements to meet his *prima facie* case:

> (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment.

*See Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1361 (11th Cir. 1994); *see also Brown v. Snow,* 440 F.3d 1259, 1265 (11th Cir. 2006) (quoting with approval these elements set out in *Virgo).*

Cook identifies three of Richards's remarks that he interpreted as sexual harassment: two remarks about "chocolate in my peanut butter" and a third incident in which Richards asked for Cook's reaction if Laura Woods had said that she liked his hair down and that he had a nice behind.

A.  "Chocolate in my Peanut Butter" Remarks

Cook states that Richards twice told him that he had his "chocolate in my peanut butter" and made these remarks in a flirtatious tone of voice.  Cook argues that drawing reasonable inferences from the evidence requires the court to see the remarks as a sexual advance.  Richards responds that Cook mischaracterizes his remarks; instead of making sexual advances, Richards was attempting to make a joke about print jobs getting mixed up with each other like chocolate

17

and peanut butter in a Reese's cup.  Richards testified that he habitually made that joke to anyone at the copier when print jobs coincided and co-mingled. Cook acknowledges that Richards made the remarks only when he was at the printer, that he made the remarks when printer jobs were co-mingled, and that the remarks were not addressed only to Cook privately but occurred in the presence of Barry Hughes, who also had a co-mingled printer job.

In determining whether conduct constitutes unwelcome sexual harassment, "the nature of the sexual advances and the context in which they occurred are to be viewed in light of the totality of the circumstances at issue." *See Morgan v. Fellini's Pizza, Inc.,* 64 F. Supp. 2d 1304, 1309 (N.D. Ga. 1999).  "Generally, it is necessary that the complained of conduct have a sexual connotation."  *Early v. Morris Newspaper Corp.,* 54 F. Supp. 2d 1261, 1268 (M.D. Ala. 1999). Under the totality of the circumstances in the instant case, the court cannot reasonably characterize these comments as sexual in nature and  neither were they reasonably construed as sexual harassment.  If Richards's joke was misunderstood and fell flat, that misunderstanding does not transform it into sexual harassment, particularly when Cook did not communicate his misunderstanding to Richards.

Even if Richard's joke did constitute a sexual advance—and the court does not find that it did—the existence of a sexual advance does not necessary equal sexual harassment.  Where, as here, a plaintiff is asserting a theory of sexual harassment based on a tangible employment action, he must show some nexus between the sexual request and the job-related reprisal.  Cook does not contend that Richards *explicitly* conditioned any job benefit or detriment upon Cook responding positively to his "sexual advance."  And while such an explicit condition is not required, Cook

must present "some evidence of a threatened or promised impact on employment," whether it be implicit or explicit. *Early,* 54 F. Supp. 2d at 1268.

Cook's argument is that reasonable inferences require the court to view Richards's joke as a sexual advance and a threatened impact on his employment.  To support his argument that Richards's remarks represented sexual innuendo, Cook cites the cases of *Bridges v. Eastman Kodak Co.,* 885 F. Supp. 495, 498 (S.D.N.Y. 1995) and *Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir. 1998), neither of which is binding on this court.  In any event, a review of these cases reveals that the conduct alleged/proved is not analogous to the conduct alleged here.

In *Bridges,* the court held that employees were not required to allege that they were sexually propositioned to make a *quid pro quo* claim when the allegations in the complaint stated that the supervisor "referred to [plaintiffs] and other women as 'bitches,' made remarks about what he wanted to do sexually to women at work, 'attacked women verbally, raised his fists, screamed in their faces,' and criticized plaintiffs' work and behavior in terms of their sexuality." The supervisor also threatened to discipline and terminate plaintiffs if they complained to upper management.  885 F. Supp. at 496.  As is clear from this summary, the facts in *Bridges* are not analogous to those of the instant case, and *Bridges* does not otherwise provide support for Cook's argument that the "chocolate in my peanut butter" remarks constitute sexual harassment.

In the other case Plaintiff cites as support, *Lipsett,* the First Circuit Court of Appeals reversed and remanded the district court's grant of summary judgment in favor of certain VA officials when a female resident brought action against him and other Defendants after she was dismissed from the residency program.  The sexual harassment alleged in *Lipsett* included the following: inferior "on-call" rooms for women;  warnings that a resident who supervised her, and

who eventually became chief resident, wanted to drive women out of the program; specific comments by a supervising fourth-year-resident evidencing his disdain for women, such as comments that women should not be surgeons because they were unreliable during menstruation, which he characterized as being "in heat"; male residents plastering the walls where residents congregated with Playboy centerfolds; the posting on a bulletin board of a list of sexually charged nicknames of all female residents; posting on the wall a sexually explicit drawing of the plaintiff's body; offers to the plaintiff from male residents to protect her from harassment if she would have sexual relationships with them; hostile/unfriendly attitudes of two male residents who were her superiors when she rebuffed their repeated sexual advances; the chief resident's response to her complaints about sexual harassment that "it was 'characteristic' for a 'low level woman resident to keep a relationship with a high level resident or an attending in order to ease her way through [the Program].'" 864 F.2d at 887-888.

The Court of Appeals found that, "viewing the record in the light most favorable to the plaintiff, the defendants *should* have known of sex discrimination (and harassment) in the Program, and noted that some evidence, if believed, supported that certain defendants *actually* knew of it. Despite that actual or constructive knowledge, they took no steps to investigate the sex discrimination allegations. Thus, their conduct "could be found to be 'gross negligence amounting to deliberate indifference." *Id.* at 907.

The Plaintiff in the instant case cites *Lipsett* for the proposition that the alleged sexual harassment "can include 'physical gestures' or 'verbal expressions.'" While that proposition may be true, the verbal expressions and other rather extreme forms of harassment in *Lipsett* were quite

20

obviously sexual in nature.  In contrast, the "chocolate in my peanut butter" remarks in the instant case are not blatantly sexual comments in the context in which they were uttered.

Thus, the facts of the two cases Cook cites are not analogous; neither *Bridges* nor *Lipsett* provides support for Cook's argument that the "chocolate in my peanut butter" remarks constitute sexual harassment. The multiple inferences that Cook asks this court to draw are too tenuous and are not supported by the evidence.  He asks the court to characterize the "chocolate in my peanut butter" remarks as sexual advances when the context of the remarks, with the mixed-up printer jobs and another worker present, do not support that interpretation.  He further asks the court to infer a threatened or promised impact on employment.  However, the evidence simply does not support these inferences, and does not otherwise support a nexus between the alleged harasser's remarks and any job deficit.

The court FINDS that, viewed in the light most favorable to Cook, Richards's remarks raise no *reasonable* inferences that he was making sexual advances or otherwise harassing Cook based on sex.  Thus, the court FINDS that Cook has not met elements two (unwelcome sexual harassment) and three (harassment based on sex) of his *prima facie* case.  Further, because he has not established a nexus between his reaction to the remarks and any job deficit, he has not established element four of his *prima facie* case. Because Cook has not established his *prima facie case,* the motion for summary judgment is due to be granted as to the claim for sexual harassment based on the "chocolate in my peanut butter" remarks.

B.  Richards's Remarks to Cook about Laura Woods

The only other incident of alleged sexual harassment occurred in August or September of 2011.  According to Cook, Richards was meeting privately with Cook, and asked what Cook's

response would be if Laura Woods had said that she thought Cook looked nice with his hair down (Cook usually wore his dreadlocks pulled back) and that she liked Cook's behind.

Given Cook's previous argument that Richards himself was making sexual advances toward him when he made his "chocolate in my peanut butter" remarks, his presentation of this conversation as sexual harassment is perplexing.  In this conversation, Richards appears to be fishing to determine if Cook returned Woods's interest, either at Woods's instigation or as self-appointed cupid.  This conversation, then, contradicts Cook's argument that Richards was previously "coming on" to him.

In his deposition, Cook explains this incident as sexual harassment because "we was supposed to be talking about the procedures to improve the process, but instead we were talking about things that have to do with my body."  (Doc. 17-2, at 43).  However, even if he considered the personal remarks to be inappropriate, inappropriate remarks do not necessarily equal sexual harassment.

The Eleventh Circuit has explained that "Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc. ,* 523 U.S. 75, 80 (1988)).   Title VII is not designed to hold companies liable for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Faragher,* 524 U.S. at 788 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992) (footnotes omitted).

To show sexual harassment, then, Cook must do more than present evidence of inappropriate remarks; where, as here, a plaintiff asserts a tangible employment deficit, he must

show some nexus between the alleged harasser's remarks and the job deficit.  In his answer to interrogatories, Cook stated that he took these comments "as Mr. Richards seeing if Mr. Cook was open to an office romance." (Doc. 17-4, at 47).  The nexus that Cook is trying to draw between this conversation and a subsequent job deficit might have potential if Richards's overtures were for himself, if the overtures carried some threat of job impact, and if Cook had rebuffed them.  But the potential for romance raised here was not with Richards; it was with Woods.  And instead of rebuffing this overture or complaining about its inappropriateness, Cook responded, "I would tell her thank you, like if she was to have those comments." (Doc. 17-2, at 51, pp. 189-90).

In any event, Cook argues that this conversation represents sexual harassment, and he offers  two adverse employment actions allegedly resulting from it: Cook's placement on the 2011 PIP and his termination.  However, Cook acknowledges that this conversation occurred in August or September of 2011, after the PIP process was underway.  Thus, the court FINDS that Cook has not met his *prima facie* case as to this incident's causing his placement on the PIP.

 The only tangible employment action that could possibly have *followed* the conversation was his termination decision, that occurred no later than September 22, although it was effective at the end of December 2011.  So, at best, Cook's argument is that *Richards's* attempt to determine whether Cook might be open to an office romance with *Woods*, which attempt Cook did not rebuff or complain about until after he left Hubbell, somehow caused management to terminate him.

Cook has not articulated a coherent theory of sexual harassment.  With the "chocolate in my peanut butter" comments, he argues that Richards was making homosexual advances.  With

23

Richards's comments referencing Woods, Cook argues that Richards was trying to set him up with Woods, encouraging a heterosexual office romance. And, even though Richards was not making an overture on his *own* behalf and even though Cook did not react negatively to the final overture, Cook argues that the conversation caused his termination.  That argument makes no logical sense.

As to Cook's claim for sexual harassment based on Richard's remarks referencing Woods's attraction to Cook, the court FINDS that Cook has not met his *prima facie* case.  Even assuming *arguendo* that Richards's overtures regarding Woods were secretly unwelcome to Cook, the evidence reflects that he did not so advise Richards or Woods; the evidence does not reflect that Cook's *reaction* ("thank you") to the overtures about Woods affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment.  Accordingly, summary judgment is due to be granted as to the claim for sexual harassment based on those remarks.

C.  Alternative Ruling as to Pretext

As an alternative ruling on all allegations of sexual harassment—Richards's "chocolate in my peanut butter" remarks as well as his remarks referencing Woods's attraction to Cook—the court FINDS that Cook has not established pretext.  Hubbell has presented a legitimate, non-discriminatory reason for placing Cook on the 2011 PIP and for Cook's termination: the repeated errors in his work.  To establish pretext, Cook must show "both that the reason was false *and* that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original).  He "must meet [the] reason head on and rebut it, and the employee

cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport,* 229 F.3d 1021, 1030 (11th Cir. 2000).

In the instant case, however, Cook has not provided any evidence that the legitimate, non-discriminatory reason was false.  To the contrary, he acknowledged that he made more errors than any other employee, and the evidence confirms that fact.  He acknowledges that he was placed on a PIP in 2010, *before the alleged harassment,* because of a the number of errors in his work projects.  He also acknowledges that in 2011, he received an evaluation *before the alleged harassment* that rated him "Below Target," again because of continued errors in his work. His supervisors' undisputed testimony is that the normal result of receiving such a rating is PIP placement, and they *began the process* of developing a 2011 PIP for him as a result, *before the alleged harassment.*  Further, the evidence reflects that he continued to make numerous errors even after being placed on the PIP.  For example, during the thirty days immediately after being placed on the PIP, eleven errors occurred in his work product.  Cook has not identified any other employee who was similarly situated, and yet, who was not placed on a PIP and terminated

Accordingly, Cook has not presented evidence raising a genuine issue of material fact that the reason given for his placement on the 2011 PIP and the reason given for his firing—an unacceptable level of errors in his work product—was a pretext for discrimination. Thus, as an alternative ruling, the court FINDS that Cook has failed to establish that the reason for placing him on the 2011 PIP and for ultimately terminating his employment was pretextual nor has he otherwise raised a genuine issue of material fact regarding pretext.

## IV.  CONCLUSION

For the reasons stated in this Memorandum Opinion, the court FINDS that summary

judgment is due to be GRANTED as to all claims.

The court will enter a simultaneous Order consistent with this Memorandum Opinion.

Dated this 5th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

## Exhibit A

| Errors Total/ design | Cook | Blake | Bond | Donahue | Edge-worth | Head | Hughes | Key | Pannell | Woods |
|---|---|---|---|---|---|---|---|---|---|---|
| Feb '11 | 6/2 | | | | 8/5 | 2/0 | 6/3 | 7/6 | | 1/1 |
| Mar '11 | 11/5 | | | | 14/6 | 12/6 | 24/10 | 14/5 | 12/6 | |
| Apr '11 | 4/1 | | | | 11/5 | 9/3 | 4/1 | 3/3 | 7/3 | |
| May '11 | 26/7 | | 3/2 | | 16/5 | 2/2 | 7/2 | | 15/6 | 4/2 |
| Jun '11 | 16/10 | | 1/0 | 1/0 | | 5/0 | 8/1 | | 12/7 | |
| Jul '11 | 11/8 | | 1/1 | 3/2 | | 4/3 | 2/0 | | 7/4 | 5/3 |
| Aug '11 | 8/5 | | 3/2 | 9/0 | | 3/2 | 3/1 | | 8/4 | 4/1 |
| Sep '11 | 6/2 | | 1/0 | | | 3/3 | 3/1 | | 6/1 | 6/4 |
| Oct '11 | 8/5 | | | | | 3/0 | 4/0 | | 6/0 | 3/2 |
| Nov '11 | 4/2 | 1/1 | | | | | | | 3/2 | 3/1 |
| totals | 100/47 | 1/1 | 9/5 | 13/2 | 49/21 | 53/19 | 61/19 | 24/14 | 76/33 | 26/14 |